United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ALAN YOCOM,

Plaintiff,

v.

ROSANA LIM-JAVATE, et al.,

Defendants.

_________________________________/

No. C 11-4738 SBA (PR)

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

(Docket Nos. 41, 48)

## INTRODUCTION

On September 22, 2011, Plaintiff Michael Alan Yocom,[1] a former state prisoner, filed the instant pro se civil rights complaint pursuant to 42 U.S.C. § 1983 alleging that Defendants Dr. Rosana Lim-Javate and Nurse Practitioner Patricia Saathoff were deliberately indifferent to his serious medical needs. The alleged incidents occurred from September 2010 until January 2011, while Plaintiff was incarcerated at the Correctional Training Facility ("CTF") in Soledad, California. Plaintiff seeks monetary damages.[2]

On November 16, 2012, Defendant Javate filed a motion for summary judgment. (Docket no. 41.) On January 18, 2013, Defendant Saathoff also filed a motion for summary judgment. (Docket no. 48.) Both Defendants allege that Plaintiff does not have a serious medical need, that they were not deliberately indifferent to his medical needs, and that they are otherwise entitled to qualified immunity. Plaintiff has filed an opposition as well as a sur-reply to each motion. Each Defendant has replied to Plaintiff's opposition.

For the reasons discussed below, the Court GRANTS Defendants' motions for summary

---

[1] The California Department of Corrections and Rehabilitation ("CDCR") records refer to Plaintiff by the name "Yocum," though the unique inmate identification number for Yocum is the same as Plaintiff's. The Court uses the spelling "Yocom" which Plaintiff has used throughout this action.

[2] The Court dismissed with leave to amend Plaintiff's additional claims of conspiracy and supervisory liability against several other prison officials at CTF. On July 2, 2012, Plaintiff filed an amendment to the complaint in an attempt to remedy the deficiencies of the aforementioned claims. (Docket no. 23.) On June 6, 2013, the Court issued an Order dismissing without further leave to amend the supervisory liability and conspiracy claims against those other Defendants, finding that Plaintiff had an opportunity to remedy the deficiencies in each claim, but failed to do so. (Docket no. 56.)

United States District Court
For the Northern District of California

judgment.

## FACTUAL BACKGROUND

### I. Background Relating to Parties

The events at issue occurred beginning in September 2010 until January 2011, during which time Plaintiff was in the custody of the CDCR at CTF. Plaintiff's medical records from CTF indicate a history of complaints involving pain in to his neck/cervical spine related to degenerative disc disease and a litany of treatments administered to alleviate this pain. (Javate Decl. ¶ 6; Saathoff Decl. ¶ 9, Ex. 1 at CDC 1487-1488, 1657.) He also has a history or substance abuse involving cocaine and methamphetamine and mental illness. (Saathoff Decl. ¶¶ 7, 8.)

CTF medical staff previously prescribed palliative (pain) treatment, instructed Plaintiff to wear a cervical neck collar, and administered one epidural steroid injection to relieve some of his pain. (Saathoff Decl. ¶ 10, Ex. 1 at CDC 639-641, 1080, 1196, 1630, 1668.) Plaintiff had previously refused palliative treatment and visited the clinic without the prescribed neck collar. (Id. ¶ 10.) Medical staff suggested Plaintiff receive a series of three steroid injections, but after a single injection, Plaintiff signed a Refusal of Examination And/Or Treatment refusing further epidural treatment and continued to complain of severe pain.[3] (Id. ¶ 11, Ex. 1 at CDC 632, 633.)

Defendant Saathoff provided full time professional health services to inmates at CTF from February 22, 2010 through December 31, 2010, and served as the acting primary care provider to Plaintiff from October 28, 2010 through December 2010. (Id. ¶ 6.)

From July 1, 2010 to December 31, 2010, Defendant Javate served as Acting Chief Physician and Surgeon at CTF, responsible for directing and supervising Clinical Care Services staff and advising the Health Care Services Division. (Javate Decl. ¶ 3.) During the time she served as Acting Chief Physician and Surgeon, Defendant Javate occasionally examined patients but did not provide treatment to Plaintiff nor "prescribe or terminate prescriptions for medication for [him] during the period from July 1, 2010 to December 31, 2010." (Id.) However, Defendant Saathoff did consult with Defendant Javate about Plaintiff on October 28, 2010, and Defendant Javate

[3] The injected medication accumulates in the spine with subsequent injections, and "the effect of refusal of epidural injection could cause an increase in pain." (Javate Decl. ¶ 15.)

subsequently examined Plaintiff on January 18, 2011, as explained below. (Id. ¶ 13; Saathoff Decl. ¶ 24.)

## II. Background Relating to Plaintiff's Medical Treatment

### A. Prior to September 2010

Both morphine and methadone are Schedule II controlled substances, which are considered to have strong potential for abuse or addiction, but also have certain medical uses. 21 U.S.C. § 812(b)(2). Due to this strong potential for abuse, inmates prescribed narcotic pain medication are required to sign a Treatment and Consent Agreement for Narcotic Pain Medication ("Consent Agreement"). (Javate Decl. ¶ 8, Ex. 1 at CDC 1265-1266.)

In July 2009, Plaintiff initially received a prescription for narcotic pain medication and entered into a Consent Agreement. (Id.) In doing so, Plaintiff agreed to submit to periodic urine drug screens, and that his clinician would discontinue his narcotic pain medication if the prescribed amount was not found in his system. (Id.) The Consent Agreement specifically provides: "If the medication I have been prescribed is not found in the correct amount in my system it will be assumed that I no longer need the medication and it will be stopped." Id. (emphasis added). In addition, CDCR's pain management guidelines instruct medical staff to discontinue prescriptions for narcotic pain medication where a patient is suspected of active diversion of medication or unwillingness to comply with the treatment plan. (Saathoff Decl. ¶ 18.)

In August 2010, just prior to the events at issue, Plaintiff was receiving Morphine Sulfate ("morphine") at a 15 mg. dose in the morning, a 30 mg. dose at noon, and methadone twice per day at a 10 mg. dose. (Javate Decl. ¶ 4, Ex. 1 at CDC 354, 356, 511, 1347, 1353, 1355.)

### B. September 2010

On September 11, 2010, CTF correctional officers found Plaintiff in possession of a white powder, which later tested positive for morphine. (Saathoff Decl. ¶ 14.) A nurse verified that Plaintiff was prescribed morphine on or immediately prior to the date the officers found the powder, and that Plaintiff would have therefore tested positive for morphine in his system if he had taken his medication as prescribed. (Javate Decl. ¶ 11.) On September 13, 2010, Plaintiff provided a urine sample to CTF prison officials. (Id.)

**United States District Court**
For the Northern District of California

On September 22, 2010, the lab report indicated that Plaintiff had tested negative for morphine. (Id., Ex. 1 at CDC 508.) Upon receiving the report, CTF prison officials concluded that Plaintiff was not taking his prescribed medication and, therefore, had violated his Consent Agreement. (Id.) CTF Lieutenant R. Holman informed prison officials and medical staff in a Memorandum that they were investigating Plaintiff for narcotic pain medication abuse. (Opp'n to Defendant Javate's MSJ, Ex. B.) CTF prison officials suspected Plaintiff of cheeking (hiding in his mouth instead of swallowing) his morphine pills and diverting them for unauthorized use. (Saathoff Decl. ¶ 17.) In response to the Memorandum, Plaintiff's primary care physician, Dr. Roselle Branch, reported that beginning on September 23, 2010, she planned to taper him off of morphine over a period of fifteen days to avoid withdrawal symptoms and continue him on a low dose of methadone. (Javate Decl. ¶ 10.)

Plaintiff alleges that Defendants fabricated the test results and that prison officials had no evidence that he had morphine in his possession. (Opp'n to Defendant Javate's MSJ at 2.) However, Plaintiff proffers Lt. Holman's Memorandum and a CDCR Form 128 ("chrono") from Senior Registered Nurse G. Lauber documenting the circulation of the Memorandum to CTF staff. The chrono specifically states that CTF prison officials received the Memorandum which reported that a white powder substance was confiscated from Plaintiff on September 11, 2010, and that the powder tested positive for morphine. (Id., Ex. B.)

Plaintiff further contends that there is "no credible evidence" that he ever tested negative for his prescribed drugs, i.e., morphine and methadone.[4] Inconsistently, however, Plaintiff attaches the

---

[4] Plaintiff claims Lt. Holman's Memorandum and Nurse Lauber's chrono contradict the September 13, 2010 negative urine test result. Plaintiff points out that Lt. Holman's Memorandum states: "I am requesting verification Inmate Yocum [sic] was prescribed prescription medications which *may have caused the urine sample to test positive* for the presence of Morphine at the time of the discovery of a suspected controlled medication/substance." (Opp'n to Defendant Javate's MSJ, Ex. B (emphasis added.) The Court disagrees. Lt. Holman is not referring to any particular positive test result; instead, he concludes that a positive test would be likely based on Plaintiff's prescription for narcotic pain medication. Also, it was not until *September 27, 2010* when CTF prison officials received the negative urine test result. (Javate Decl., Ex. 1 at CDC 508.) Therefore, Lt. Holman could not have been aware of such a result because he drafted his Memorandum five days earlier, on *September 22, 2010.* For the same reason, Nurse Lauber's chrono could not have contradicted Plaintiff's negative urine test result because she drafted the chrono four days earlier, on *September 23, 2010.* In any event, Nurse Lauber's chrono does not refer to any urine test result, rather it states that the "suspected controlled medication/substance" tested positive for morphine. (Id.)

September 22, 2010 test results indicating that his urine sample from September 13, 2010 was negative for morphine.[5] (Id., Ex. B.) Thus, there is no evidence that CTF officials fabricated his drug test results, which the Court thus accepts as genuine and accurate.

**C. October 2010 through December 2010**

On October 28, 2010, Defendant Saathoff examined Plaintiff to assess his complaints of pain. (Saathoff Decl. ¶ 21.) In preparation for the assessment, Defendant Saathoff reviewed Plaintiff's medical records and was aware that he had violated his Consent Agreement. (Id. ¶¶ 19, 20.) She was also aware that, as a result, Plaintiff's morphine had been tapered off and discontinued, and that he was receiving a daily low dose of methadone as well as another medication called carbamazepine.[6] (Id. ¶ 22.) Defendant Saathoff determined it was medically appropriate to discontinue his narcotic pain medication entirely at that time. Defendant Javate, who was the supervising physician at that time, agreed with Defendant Saathoff's assessment. (Id. ¶ 24; Javate Decl. ¶ 13.) Defendant Saathoff opined that discontinuance of the low dosage of methadone Plaintiff had been receiving would not cause him any negative withdrawal symptoms. (Saathoff Decl. ¶ 23.)

On November 30, 2010, Defendant Saathoff examined Plaintiff, who requested that the prescriptions for his narcotic pain medication be resumed. (Saathoff Decl. ¶ 30.) Defendant Saathoff referred Plaintiff to a pain specialist who previously administered epidural injections for Plaintiff, and ordered an x-ray of his cervical spine as well as several different lab tests. (Id.) Defendant Saathoff ordered a second urine drug screen test to confirm that Plaintiff did not have any unprescribed narcotic pain medication in his system, and suggested to Plaintiff that he complete an

---

[5] Plaintiff claims that the September 22, 2010 "Daily Laboratory Report" contradicts a November 19, 2010 memo by Correctional Sergeant B. Greer, which Plaintiff has attached to his Opposition. This memo is a "Supplemental Page" to the first level reviewer's response to Plaintiff's 602 inmate appeal. It states that on November 9, 2010, Sgt. Greer "contacted the National Toxicology Laboratories" and that he was told that "urine samples are not tested for the presence of Methadone." (Opp'n, Ex. B.) It matters not that Plaintiff's urine sample was not tested for Methadone because the results indicate that Plaintiff tested negative for *Morphine*. Therefore, the Court finds that these documents do not contradict each other.

[6] Carbamazepine or Tegretol is an anticonvulsant medication that has palliative qualities and has been demonstrated to alleviate chronic neurologic pain. (Saathoff Decl. ¶ 22; Javate Decl. ¶ 13.)

updated Consent Agreement. (Id.) Around December 7, 2010, urine results revealed that Plaintiff did not have morphine or methadone in his system. (Id. ¶ 27.) Plaintiff did not complete an updated Consent Agreement. (Id. ¶ 25.)

On December 9, 2010, Defendant Saathoff prescribed Plaintiff with Ibuprofen and Gabapentin to address his continued complaints of chronic pain. (Id. ¶ 28.) Both Defendants opine that the administration of these medications was a medically accepted alternative to treatment with narcotic pain medication. (Id. ¶ 29; Javate Decl. ¶ 16.)

**D. January 2011**

On January 18, 2011, Defendant Javate examined Plaintiff to assess his candidacy for treatment with narcotic pain medication and administered a pain relief injection called Toradol, which is used to treat moderate to severe pain. (Id. ¶¶ 17, 18.) Defendant Javate claims that the aforementioned treatment is a medically appropriate one, in lieu of narcotic pain medication. At that time, Defendant Javate reviewed Plaintiff's records, which indicated Plaintiff had been failing to regularly take his prescribed pain medication. (Id. at ¶ 18.) Thus, Defendant Javate claims she concluded that Plaintiff was not a candidate for treatment with narcotic pain medication due to non-compliance with prescribed medication treatment and the availability of medically acceptable alternative treatments. (Id.)

## LEGAL STANDARDS

### I. Standard of Review for Summary Judgment

Summary judgment is appropriate where the pleadings, discovery, and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party

will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. Id. If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." Id. at 323.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The district court is only concerned with disputes over material facts, and "factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).

At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party; if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).

**II. Legal Standard for Deliberate Indifference to Serious Medical Needs**

"Deliberate indifference to serious medical needs" violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). A determination of deliberate indifference involves an examination of two elements: first, the seriousness of the prisoner's medical need, and second, the nature of the defendants' response to that need. See McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." Id. at 1059 (citing Estelle, 429 U.S. at 104). The existence of an injury that a reasonable doctor or patient would find

United States District Court
For the Northern District of California

important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment. Id. at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Under the Eighth Amendment, deliberate indifference requires a showing that prison officials possess a sufficiently culpable state of mind. See id. at 834. There must be a purposeful act or failure to act on the part of the defendant, as well as resulting harm. McGuckin, 974 F.2d at 1060. A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Where doctors have chosen one course of action and a prisoner-plaintiff contends that they should have chosen another course of action, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, . . . [and] that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

## DISCUSSION

### I. Serious Medical Need

Defendants argue that Plaintiff did not have a serious medical need requiring the administration of narcotic pain medication. The Court disagrees. The record shows that Plaintiff has a history of complaints involving severe pain to his neck/cervical spine due to degenerative disc disease, and that such complaints have necessitated medical treatment. Thus, the Court finds that there is sufficient evidence for purposes of the instant motions to support Plaintiff's claim that he has a serious medical need. As such, the Court addresses whether Defendants were deliberately indifferent to Plaintiff's serious medical needs.

### II. Deliberate Indifference

#### A. Defendant Saathoff's Actions From October 2010 Through December 2010

Plaintiff claims that Defendant Saathoff discontinued his prescription for narcotic pain

medication with deliberate indifference to his serious medical needs. Defendant Saathoff counters that it was medically acceptable and consistent with CDCR pain management guidelines to discontinue Plaintiff's prescription for narcotic pain medication where, as here, the inmate was suspected of non-compliance with a prescribed course of treatment.

The Court finds that Plaintiff has failed to show a triable issue of material fact on his deliberate indifference claim against Defendant Saathoff. The record shows that contraband morphine was found in Plaintiff's cell and had violated his Consent Agreement, thereby suggesting that he was diverting his narcotic pain medication and not complying with his treatment plan. (Saathoff Decl. ¶¶ 17, 18.) When an inmate is suspected of misusing narcotic pain medication, the general CDCR protocol is to first taper off each medication that tends to cause withdrawal symptoms prior to the discontinuance of all narcotic pain medication. (Id. ¶ 18.) As mentioned above, the Consent Agreement executed by Plaintiff warned that if the narcotic pain medication prescribed is "not found in the correct amount" in the patient's system, "it will be assumed that [the patient] no longer need[s] the medication and it will be stopped." (Id. ¶ 13, Ex. 1 at CDC 1265-1266.) By signing the Consent Agreement, Plaintiff indicated that he understood the rules, and that if he failed to follow them, his "pain management clinician will not be able to continue to prescribe [the] medications." (Id.) CTF medical staff tapered off Plaintiff's dose of morphine beginning September 23, 2010 to avoid withdrawal symptoms prior to discontinuing all narcotic pain medication, and the undisputed facts show that Defendant Saathoff was not involved in that initial decision.

Defendant Saathoff first met with Plaintiff on October 28, 2010, when his previous primary care physician, Dr. Branch, had already discontinued his prescription for morphine. At that time, Plaintiff was taking a low dose of methadone as well as alternative pain medication. Defendant Saathoff considered Plaintiff's complaints of pain and discussed with him that his failure to take his narcotic pain medication as prescribed in September 2010, in violation of the Consent Agreement, necessitated that she discontinue all narcotic pain medication. (Saathoff Decl. ¶ 21.) In her decision to terminate Plaintiff's low dose methadone treatment, Defendant Saathoff noted that the dosage to be discontinued would not cause adverse withdrawal symptoms for Plaintiff. (Id. ¶ 22.) In addition,

she knew that Plaintiff was receiving carbamazepine which would ameliorate his reported pain. (Id. ¶ 22.)

Although Plaintiff disagrees with Defendant Saathoff's recommended course of treatment, the record evidence shows that over a course of several months, Defendant Saathoff made reasonable attempts to address his complaints of pain. Rather, Defendant Saathoff: (1) recommended treatment that evolved over time based on continued evaluation of Plaintiff's responses to treatment; (2) discontinued Plaintiff's low dose of methadone pursuant to an existing policy that a prescription for narcotic pain medication was contraindicated for a patient who was diverting such medication; and (3) offered alternative pain medication and treatment in place of his narcotic pain medication. While Plaintiff may have preferred a different course of treatment, a difference in opinion as to the course of his medical treatment, which is insufficient, as a matter of law, to establish deliberate indifference. See Toguchi, 391 F.3d at 1058, 1059-60. Summary judgment for Defendant Saathoff is therefore GRANTED.

**B. Defendant Javate's Actions**

**1. July 2010 Through October 27, 2010**

Plaintiff claims that Defendant Javate deprived him of morphine and methadone in deliberate indifference to his serious medical needs. Defendant Javate contends that while she was Acting Chief Physician and Surgeon from July through December 2010 she did not: (1) prescribe any medication or treatment to Plaintiff; (2) cancel any prescribed medication or treatment; or (3) have a physician-patient relationship with Plaintiff. (Javate Decl. ¶ 3.)

During the time period from July through December 2010, Defendant Javate worked as Acting Chief Physician and Surgeon at CTF. (Id.) In that capacity, she was responsible for "planning, directing, and supervising the work of the Clinical Care Services staff, for supervising subordinate physicians, for implementing general policy directives, directing the clinical work of the department, [and] advising the Health Care Services Division." (Id.) She did not provide treatment to Plaintiff and did not prescribe or terminate any medications for him during this time period. (Id.)

Supervisory liability may be imposed against a supervisory official in his individual capacity only "for his own culpable action or inaction in the training, supervision, or control of his

United States District Court
For the Northern District of California

subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." Preschooler II v. Davis, 479 F.3d 1175, 1183 (9th Cir. 2007) (internal quotation and citation omitted). Because the Court has found no constitutional violation on the part of her subordinates (specifically, Defendant Saathoff), Defendant Javate cannot be held liable as a supervisor. See Redman v. Cnty. of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (holding supervisor ordinarily "is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them"). Traditionally, there is no liability under § 1983 solely because one is generally responsible for the actions or omissions of others. See Taylor, 880 F.2d at 1045.

Here, Plaintiff has failed to raise a triable issue of fact that Defendant Javate either was personally involved in the alleged unconstitutional termination of Plaintiff's prescription for narcotic pain medication, or that she directed, or knew of and wrongfully failed to prevent, such allegedly inadequate care from July 2010 to October 27, 2010. Therefore, there is no genuine issue of material fact as to whether Defendant Javate acted with deliberate indifference at that time.

**2. October 28, 2010**

On October 28, 2010, Defendant Javate opined that "it was medically appropriate to discontinue the methadone" when Defendant Saathoff concluded Plaintiff's prescription for narcotic pain medication should be entirely discontinued.[7] To the extent Plaintiff is attempting to predicate Defendant Javate's liability as a supervisor, Plaintiff must show that as a supervisor, Defendant Javate was (1) personally involved in the constitutional deprivation, or (2) had a sufficient causal connection between his or her wrongful conduct and the constitutional violation. Henry A. v. Willden, 678 F.3d 991, 1001-04 (9th Cir. 2012) (citing Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011)). However, since the Court has concluded that Defendant Javate's subordinate, Defendant Saathoff, is entitled to summary judgment for her alleged actions, Defendant Javate cannot be held

---

[7] Though Defendant Javate was not Plaintiff's primary care provider at that time, the record suggests that as the Acting Chief Physician and Suregon, she played a supervisory role in Defendant Saathoff's decision to discontinue Plaintiff's methadone on October 28, 2010. (Saathoff Decl. ¶ 24; Javate Decl. ¶ 13.) Defendant Saathoff states that she consulted with Defendant Javate after she made the aforementioned decision, and Defendant Javate agreed with her. (Saathoff Decl. ¶ 24.)

liable as her supervisor. See Jackson v. City of Bremerton, 268 F.3d 646, 653-54 (9th Cir. 2001).

**3. January 2011**

In January 2011, Defendant Javate had a physician-patient relationship with Plaintiff as his primary care physician. (Javate Reply at 5.) She examined Plaintiff on January 18, 2011, provided a Toradol injection to relieve his pain, and determined that Plaintiff "was not a candidate for treatment with narcotic pain medication." (Javate Decl. ¶ 18.) In support of her motion for summary judgment, Defendant Javate has presented evidence that, based on her medical evaluations and Plaintiff's recent non-compliance with prescribed medication treatment, the prior termination of his prescription for narcotic pain medication was "medically acceptable." (Id. ¶ 19.) Defendant Javate also considered that Plaintiff "did not display any secondary signs of chronic pain such as muscle spasms or muscle atrophy," and determined the pain treatment plan without narcotic pain medication was appropriate at that time. (Id. ¶ 18.) Plaintiff maintains that Defendant Javate should have provided him with narcotic pain medication to treat his complaints of chronic neck/cervical pain.

Plaintiff has failed to provide evidence that Defendant Javate knew that Plaintiff faced a substantial risk of serious harm in the administration of alternative prescriptions to treat pain, and then disregarded that risk by failing to take reasonable steps to abate it. See Farmer, 511 U.S. at 837. Defendant Javate provided an injection that was medically appropriate treatment for neck/cervical pain in lieu of narcotic pain medication. (Javate Decl. ¶ 17.) Plaintiff offers no evidence that the course of treatment Defendant Javate followed was medically unacceptable or chosen in conscious disregard for his health. See Jackson, 90 F.3d at 332. While Plaintiff may disagree with the treatment recommended by Defendant Javate, such disagreements do not create triable issues in support of his claim that Defendant Javate acted with the deliberate indifference necessary for Plaintiff to survive summary judgment. See Toguchi, 391 F.3d at 1058, 1059-60. Accordingly, summary judgment for Defendant Javate is GRANTED.

**III. Qualified Immunity**

In the alternative, Defendants move for summary judgment on qualified immunity grounds. The defense of qualified immunity protects "government officials . . . from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was "clearly established." Pearson v. Callahan, 555 U.S. 223, 236 (2009) (overruling the sequence of the two-part test that required determination of a deprivation first and then whether such right was clearly established, as required by Saucier and holding that court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case). In the absence of clearly established law that certain conduct constitutes a constitutional violation, a defendant cannot be on notice that such conduct is unlawful. Rodis v. County of San Francisco, 558 F.3d 964, 970-71 (9th Cir. 2009). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Saucier, 533 U.S. at 202; see, e.g., Estate of Ford v. Caden, 301 F.3d 1043, 1049-50 (9th Cir. 2002) (court may grant qualified immunity by viewing all of the facts most favorably to plaintiff and then finding that under those facts the defendants could reasonably believe they were not violating the law).

Viewing the evidence in the light most favorable to Plaintiff, the Court has determined above that Defendants' actions did not constitute an Eighth Amendment violation for deliberate indifference to serious medical needs. Nonetheless, assuming arguendo that even if Defendants had violated Plaintiff's constitutional rights, in light of clearly established principles at the time of the incident, Defendants could have reasonably believed their conduct was lawful. See id. Specifically, the Court finds that a reasonable medical staff member in Defendants' position would not have found unlawful their decision to discontinue Plaintiff's prescription for narcotic pain medication entirely, especially in light of the medically appropriate pain medication and treatment they offered in its place.

Based on the evidence available to Defendants, their actions were reasonable and

United States District Court
For the Northern District of California

appropriately tailored to treat Plaintiff's condition. Defendants received information that Plaintiff was not taking his medication, in violation of the Consent Agreement, thus suggesting that he was abusing narcotic pain medication. In accordance with the Consent Agreement and CDCR protocol, Defendants concluded Plaintiff's prescription for narcotic pain medication should be entirely discontinued. In October 2010, Defendant Saathoff discontinued Plaintiff's low dose of methadone. From October 2010 through December 2010, Defendant Saathoff prescribed Plaintiff with Ibuprofen and Gabapentin to address his continued complaints of chronic pain, which was a medically accepted alternative to treatment with narcotic pain medication. In January 2011, Defendant Javate provided an injection that was medically appropriate treatment for neck/cervical pain in lieu of narcotic pain medication. Therefore, a reasonable medical staff member in Defendants' situation could have believed that the aforementioned actions did not violate Plaintiff's clearly established constitutional rights.

Accordingly, Defendants are entitled to qualified immunity with respect to Plaintiff's deliberate indifference claim, and their motions for summary judgment are GRANTED on those grounds as well.

## CONCLUSION

For the foregoing reasons, the Court orders as follows:

1. Defendant Javate's Motion for Summary Judgment (docket no. 41) is GRANTED.

2. Defendant Saathoff's Motion for Summary Judgment (docket no. 48) is GRANTED.

3. The Clerk of the Court shall enter judgment in favor of Defendants, terminate all other pending matters, and close the file. All parties shall bear their own costs.

4. This Order terminates Docket Nos. 41 and 48.

IT IS SO ORDERED.

DATED: September 30, 2013

Saundra B. Armstrong
SAUNDRA BROWN ARMSTRONG
United States District Judge